13 F.3d 569
 22 UCC Rep.Serv.2d 583
 CHEMICAL BANK, Plaintiff-Appellant,
v.
Demetrios B. HASEOTES, Belmont VLCC I, Inc., Belmont VLCC
II, Inc. and Belmont VLCC III, Inc., Defendants-Appellees,
J. Aron & Co., Vitol Holdings B.V. and Cumberland Farms,
Inc., Intervenor-Defendants-Appellees.
 No. 742, Docket 93-7794.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 27, 1993.
Decided Jan. 5, 1994.
 
 Mark J. Hyland, New York City (Peter C. Mester, Seward & Kissel, of counsel), for plaintiff-appellant Chemical Bank.
 Stuart A. Summit, New York City (Michael J. Silverberg, Wayne Josel, Joseph Scholz, Phillips, Nizer, Benjamin, Krim & Ballon, of counsel), for intervenor-defendant-appellee Vitol Holdings, B.V.
 Melvin A. Brosterman, New York City (David Neier, Matthew Mayers, Stroock & Stroock & Lavan, of counsel), for defendant-intervenor-appellee J. Aron & Co.
 Martin P. Ochs, Goldberg & Pines, New York City (Stephen F. Gordon, Stanley W. Wheatley, Gordon & Wise, Boston, MA, of counsel), filed a brief on behalf of defendants-appellees Demetrios B. Haseotes, Belmont VLCC I, Inc., Belmont VLCC II, Inc., and Belmont VLCC III, Inc.
 Before: CARDAMONE, McLAUGHLIN and LAY,* Circuit Judges.
 PER CURIAM:
 
 
 1
 Chemical Bank (Chemical or appellant) appeals from a portion of an order of the United States District Court for the Southern District of New York (McKenna, J.), entered August 6, 1993, that denied Chemical's motions for a mandatory injunction. The order Chemical sought would have enjoined appellee Demetrios Haseotes to bring his shares of Newfoundland Energy Limited (NEL) into New York so that they could be attached, and also would have enjoined Haseotes from the sale of his NEL shares to Vitol Holdings, B.V. (Vitol), an intervenor-appellee.
 
 BACKGROUND
 A. Chemical Bank's Loan
 
 2
 In September 1990 Chemical Bank's predecessor in interest, Manufacturers Hanover Trust Company, loaned $50 million to the Belmont Corporations, three entities that together owned three "Very Large Crude Carriers." The loan was secured by mortgages on each of the ships, and by a personal guarantee of up to $20 million given by Haseotes, the sole owner of the Belmont Corporations. After the loan was made, the Belmont Corporations defaulted. Chemical alleges it gave notice of the default to the Belmont Corporations and demanded payment in full in June of 1992. In November 1992 Chemical caused the ships to be arrested, two in Greece and one in South Africa. The one arrested in South Africa was sold at auction for $4.5 million and the others were sold at auction in Greece for a combined price of about $13 million.
 
 
 3
 On April 29, 1993 Chemical sued Haseotes and the Belmont Corporations to recover the deficiency on the $50 million loan, which Chemical declares exceeds $32 million. It filed an amended complaint on June 18, 1993 that added claims against Haseotes for fraudulent conveyances in violation of the New York Debtor and Creditor Law, N.Y.Debt. & Cred. Law Secs. 273, 276 (McKinney 1980).
 
 B. The Vitol Agreement
 
 4
 Haseotes owns all of the stock of Newfoundland Energy Limited (NEL), a Bermuda Corporation. NEL in turn owns all of the stock of Newfoundland Processing, Ltd. (NPL), a Canadian corporation, that owns an oil refinery in Canada. On October 5, 1992 Haseotes entered into an agreement with Vitol to sell all of his stock in NEL to Vitol for $125 million plus an earn out worth up to $25 million. The agreement is expressly conditioned on Haseotes' settling all claims against NPL.
 
 
 5
 At the time of the Vitol agreement, the claims asserted against NPL were in excess of $200 million. Of this amount, $76.1 million comprised uncontested debts. Another $92 million was claimed by Cumberland Farms, a company in which Haseotes owns 25 percent, the remainder being owned by his relatives. Cumberland Farms is now a Chapter 11 debtor-in-possession. Included in Cumberland Farms' claim against NPL is a sum allegedly due on $52 million in advances made to Cumberland Crude Processing, Inc. (Cumberland Crude), a company in which Haseotes is a 100 percent beneficial owner. Cumberland Farms asserted this claim against NPL because NPL had guaranteed Cumberland Crude's debt on which that company had defaulted. Finally, intervenor J. Aron & Co. (Aron) claimed that it was owed $44 million by NPL for its alleged wrongful conversion of oil refined for Aron at the NPL refinery. Although prior to the Vitol agreement Aron had commenced a wrongful conversion action against Cumberland Crude, Cumberland Farms, NPL, and Haseotes as guarantor of Cumberland Crude's liability for up to $33 million, it asserted the entire amount allegedly due against NPL, because NPL agreed in writing not to dispose of the refinery's assets prior to satisfying Aron's claim.
 
 
 6
 In an attempt to meet the conditions of the Vitol agreement, Haseotes entered negotiations with Cumberland Farms and Aron, and reached agreements with both as to settlements of their respective claims against NPL. Cumberland Farms agreed that if the Vitol agreement went through, it would settle all of its claims against NPL for $23 million plus any earn out, up to another $25 million. During his negotiations with Cumberland Farms, Haseotes entered an agreement with the other shareholders in which each shareholder agreed not to receive directly or indirectly any money or other consideration or proceeds with respect to the sale of the NEL stock, or from any claim he or she might have against Cumberland Crude, NPL or NEL. There is some evidence that NPL owed Haseotes between $10-20 million. Thus, by entering this agreement, Haseotes relinquished any right he might have had to recover this purported debt. Haseotes' negotiations with Aron resulted in an agreement to settle Aron's claims against NPL for $30 million and a release of any alleged liability from Haseotes. Aron also agreed to give releases to NPL, Cumberland Crude, Cumberland Farms and Haseotes.
 
 C. Proceedings Appealed From
 
 7
 By order to show cause submitted on notice on June 21, 1993, Chemical moved for an order to attach Haseotes' assets in New York, a mandatory injunction ordering Haseotes to bring his NEL shares into New York, and a preliminary injunction enjoining the sale of the NEL shares to Vitol or attaching a portion of the sale proceeds. The order to show cause, which included a temporary restraining order preventing the closing of the sale, was signed on June 23 by United States District Judge Conboy, who later recused himself. On July 26, 1993 this case was reassigned to Judge McKenna.
 
 
 8
 Following expedited discovery, Judge McKenna held a hearing on August 4, 1993 on Chemical's motions, and also heard Vitol's, Aron's and Cumberland Farms' motions to intervene. The district court granted the motions to intervene. It also granted an attachment of any of Haseotes' assets found in New York City. The court refused to order Haseotes to bring the NEL shares to New York so that they could be attached, to enjoin the Vitol sale, or to attach a portion of the proceeds.
 
 
 9
 Chemical appeals insisting that because the district court found Chemical was entitled to an attachment, it erred in refusing to order Haseotes to bring his only substantial asset--the NEL shares--into New York, or to either enjoin the sale or attach the proceeds. We affirm.
 
 DISCUSSION
 
 10
 On appeal Chemical claims that because it was granted an order of attachment, the district court either should have ordered Haseotes to bring his shares of NEL into New York so that they could be attached, or entered a preliminary injunction preventing Haseotes from selling the NEL shares to Vitol. Fed.R.Civ.P. 64 makes available to the federal courts "all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action ... under the circumstances and in the manner provided by the law of the state in which the district court is held." The first remedy Chemical seeks here is an order directing that property located outside of the state be brought into New York so that it will be subject to the attachment order, a remedy properly treated as an injunction. See Inter-Regional Fin. Group, Inc. v. Hashemi, 562 F.2d 152, 154 (2d Cir.1977), cert. denied, 434 U.S. 1046, 98 S.Ct. 892, 54 L.Ed.2d 798 (1978).
 
 
 11
 The sole purpose of the injunction in aid of attachment is to secure funds to satisfy an eventual judgment on Chemical's guarantee and debtor creditor claims. Under New York law a creditor is entitled to such a prejudgment injunction in aid of attachment pursuant to Sec. 8-317(6) of the Uniform Commercial Code, N.Y.U.C.C.Law Sec. 8-317(6) (Consol.1993), only where the creditor meets the requirements for the issuance of injunctive relief. See Siy v. McMicking, 134 Misc.2d 164, 165-67, 510 N.Y.S.2d 407, 40709 (N.Y.Sup.Ct.1986). Thus, both of Chemical's claims on appeal must properly be assessed under the familiar standards for when an injunction should issue.
 
 
 12
 On a motion for a preliminary injunction, the established test requires a showing of irreparable harm should the injunction not be granted, and either a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping in the applicant's favor. See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979) (per curiam). We review a denial of a preliminary injunction for an abuse of discretion which, when found, usually consists of the application of an incorrect legal standard or the reliance on clearly erroneous findings of fact. Resolution Trust Corp. v. Elman, 949 F.2d 624, 626 (2d Cir.1991).
 
 
 13
 The district court made its decision on the record, simply stating: "I am going to deny the balance of the injunctive relief sought, that is, the mandatory injunction that I direct the NEL stock be brought to New York and the injunction against the Vitol deal." It sets forth its findings with respect to Chemical's guarantee claims under New York Debtor and Creditor Law, Secs. 273 and 276, concluding that Chemical had not shown a likelihood of success on the merits of those claims, and that even if it had shown serious questions going to the merits, the balance of hardships tipped equally in favor of the other parties. We have carefully reviewed these findings and do not find them to be clearly erroneous.
 
 
 14
 In contrast, we think Chemical has shown a likelihood of success on the merits of its guarantee claim. For a plaintiff to establish a prima facie case that it is entitled to recover on a guarantee under New York law, it must show: (1) that it is owed a debt from a third party; (2) that the defendant made a guarantee of payment of the debt; and (3) that the debt has not been paid by either the third party or the defendant. See Industrial Bank of Japan Trust Co. v. Haseotes, No. 92-6074, 1993 WL 322775 at * 2, 1993 U.S.Dist. LEXIS 11568, at * 6 (S.D.N.Y. Aug. 19, 1993). Chemical's documents establish these three factors. Moreover, the district court must have found a likelihood of success on the guarantee claim because such a showing was required for the issuance of an order of attachment under CPLR Secs. 6201, 6212(a) (McKinney 1980), which relief, as noted, the trial court had already granted.
 
 
 15
 But Chemical failed to demonstrate irreparable harm if Haseotes' stock in NEL is sold and the proceeds are used to settle all claims against NPL. The irreparable harm alleged by Chemical is its fear that Haseotes will render himself judgment-proof on the guarantee claim by selling the NEL stock. Yet, generally speaking, an injunction is not available to remedy a loss that may be remedied by an award of money damages. See In re Feit & Drexler, Inc., 760 F.2d 406, 416 (2d Cir.1985). Judge McKenna recognized as much at the hearing on the motion:
 
 
 16
 CHEMICAL: Chemical Bank only wants to stop the deal if Chemical Bank cannot share in some part of the proceeds of the transaction.
 
 
 17
 THE COURT: I understand.... [Y]ou can be bought off with money. That is what this case is all about.
 
 
 18
 On this point, Chemical argued that the transfer of proceeds envisioned by the Vitol sale agreement constituted a fraudulent conveyance as to Chemical. While an injunction may issue to stop a defendant from dissipating assets in an effort to frustrate a judgment, see, e.g., Republic of Philippines v. Marcos, 806 F.2d 344, 356 (2d Cir.1986), cert. denied, 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987), the trial court found no such intent here. Instead, it accepted the argument of Haseotes and the intervenors that the Vitol sale was legitimate because it permitted Haseotes to unload the indebted refinery and to pay off its creditors. Hence, the district court's conclusion, found from a fair reading of the record, that it considered and rejected Chemical Bank's claim that it would be irreparably harmed absent a preliminary injunction is amply supported.
 
 
 19
 Accordingly, the order denying the preliminary injunctions is affirmed.
 
 
 
 *
 Honorable Donald P. Lay, Senior Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation