24 F.3d 401
 62 USLW 2754, 1994-1 Trade Cases P 70,592
 Frank ACQUAIRE; Bilo II Rev. Inc.; Paul Adams; Adams Bev.
Inc.; V. Aielo; Andre Alves; A & A Beverage Dist., Inc.;
William Anderson; Mojo Satchmo Inc.; Daniel Baker; Meld
Beverage Corp.; Douglas Barnes; Barnes Dist. Inc.;
Richard Begany; R.A. Richie Bev. Dist. Inc.; Frank
Bradley; Frank J. Bradley, Sr.; Scott Browner; Scotto
Bev. Inc.; John Brunner; JCQM Beverage Inc.; Gregory
Burke; B.G.M. Beverage Inc.; James Byrnes; J.I.M. Bev.
Inc.; Nicholas Campanelli; Nikki Bev. Dist. Inc.; Russell
Candella; Russlino Bev. Inc.; Frank Carrelli, Jr.; Hylan
Bev. Inc.; Carmine Caruso; Lincoln Bev. Inc.; Nickolas
Castronvova; C & N Beverage Corp.; John Cetrulo; J.V.C.
Mixers Inc.; Gregory Clemente; G.A.C. Beverage Corp.;
Russell Compese; Compese Bev. Co. Inc.; 7650 Enterprises
Inc.; Rocco Cortese; Ann-Roc Bev. Dist. Inc.; Allen
Cowan; Mi-Cin Bev. Dist. Inc.; Robert Cummings; Cummings
Beverage Inc.; Jack Cutrone; Capt'n Jack Bev. Inc.; Pat
Dattalo; P & T Beverage Corp. III, Inc.; W.J. Debella;
Bad Beverage Inc.; A.J. Debello; A.J. Debello Jr. Inc.;
Anthony Deruvo; Anthony Deruvo Bev. Inc.; Ben Diasparra;
B & T Bev. Inc.; Michael DiOrio; 3 DiOrio's Dist. Inc.;
Richard DiCarlo; R & A Beverage Inc.; Michael DiCicco;
City Lights Bev. Inc.; John Drew; Drew Dist. Inc.;
Matthew Drohan; Mandro Bev. Inc.; Dean Ellerthorpe;
Vernon Inc. of Landing, Inc.; Robert Florio; R.R.M.
Beverage Corp.; Ed Franz; E. Franz & Sons Inc.; Herman
Gonzales; D & H Dist. Corp. Inc.; John Gregg; Ron & Jack
Bev. Corp.; Phil Gualielmetti; Rainbow Falls Beverage
Inc.; Robert Gulino; R.J.G. & Sons Bev. Inc.; Robert W.
Gunning; N & R Beverage Inc.; George Hammer; Kamel Dist.
Inc.; Paul Hartman; G.P.H. Dist. Inc.; Robert Hasenbein;
Rob-Liz Bev. Dist. Inc.; Barry Helstrom; G.S. & M. Dist.
Inc.; Russell Holhman; Ruslin Bev. Corp.; Ruslin Bev.
Dist. Inc.; Robert Holgerson; Lanson Hyatt; Hyatt Dist.
Inc.; Eugene Kelly; E & K Beverage Inc.; Phillip Lenzy;
P.P.C. Lenzy Dist. Inc.; Robert Levine; B & L Beverage
Inc.; Steve Loboda; S. Loboda Inc.; Salvatore Loggia;
S.L. & Sons Bev. Inc.; Michael Lombardo; Lombardo
Beverage, Inc.; Rocco Longo; Brock Dist., Inc.; Arthur
Loughran; Hearty Artie Bev., Inc.; Carl Lower; Bottoms Up
Dist. Inc.; Allen Lundberg; A.L. Beverages Inc.; Ken
Macri; K-MAC II Dist. Inc.; Frank Maitilasso; F.P.M.
Dist. Inc.; Mark Mattilasso; Better Buy Bev. Inc.;
Anthony Marafino; A. Marafino Bev., Inc.; James Marino;
A.W.M. Bev. Dist. Inc.; Rob Markantes; Rainbow Connection,
Inc.; Al Martin; A & S Dist. Inc.; Henry Martineau; H.E.
Martineau Inc.; Walter Mathewson; S & C Bev. Dist. Inc.;
Dennis McCrossen; JAG-D Dist. Inc.; Emilio Montesdeoca;
E.M.O. Dist. Inc.; Robert Mortenson; Robert Mortenson
Corp.; Joseph Obenauer; J.S. Bev. Inc.; Steven O'Donnell;
S.M.S. Beverage, Inc.; G. Olsen; Gunnar Olsen Inc.;
Elliot Panitch; Grey Falcon Ent. Inc.; Bruno Parisi;
Bruno Parisi & Sons, Inc.; B. Perich; Benrich Dist. Inc.;
Charlie Pettigrano; Just Beginning Inc.; Kenneth Pulford;
Southside Soda Inc.; Scott Pyper; S.R.P. Bev. Corp.;
James Reynolds; J. Reynolds Ltd. Inc.; Peter Rosenberger;
Pete's Bev. Inc.; Ciro Santacroce; Ciro Santacroce, Inc.;
Phillip Santomassi; Yorkville Bev. Inc.; Burghardt
Schrepf; Schrepf Bev. Inc.; William Schwartz; B & D
Beverage Inc.; Alex Simyavsky; Vladleen Bev. Inc.; Henry
Smith; Hank Bev. Inc.; Kevin Smith; J & S Beverage Inc.;
Anthony Soavedro; J.A.S. Beverage Corp.; James Sowlakis;
J.C.C. Bev. Dist. Inc.; Peter Sparacio; Chelsea Dist.
Inc.; Gerard Spiga; G.K. Spiga Inc.; John Staffieri;
Staffieri Bev., Inc.; Roman Strockyj; Strockyj Bev. Inc.;
Timothy Synan; South Shore Bev. Dist., Inc.; Ralph Venice;
Venice Beverage Inc.; Carlos Vilar; Vilar Bev. Inc.; Ken
Wood; Ken Wood Bev. Inc., Plaintiffs,
T & V Beverage, Inc.; Ralph Ammirati; Bev. Express Inc.;
Russell Ammirati; R & R Beverage, Inc.; Brian Bachmann;
Osprey Bev. Inc.; Peter Caffery; P.R. Caffrey Inc.;
Anthony Congialosi; Frank Dolan; Gail Bev. Dist. Inc.;
Thomas Gioeli; T & S Bev. Inc.; Richard Gresio; Carich
Bev. Inc.; Anthony Gulino; Anthonys Bev. Inc.; Alton
Hemby; Hemby Bev. Dist. Inc.; Walter Hergsthan; Herby
Beverage, Inc.; Larry Hoft; L.M.P. Dist. Inc.; Robert
Holgerson; Hogie Bev. Corp.; Ronald Hubbard; Hubs
Bev. Inc.; Anthony Ingrassellino; Deanick Bev. Inc.; Gary
Levy; Cousins Bev. Dist.; Joseph Lokitis; Jo-Aire Inc.;
J. Lombardozzi; 3 Kids Bev., Inc.; Robert Magliola; Bolyn
Bev. Inc.; Thomas Marciano; T & L Beverage, Inc.; Robert
McClean; T.J.K. Beverage Inc.; John Meister; J. Meister
Corp.; P. Parikh; Rani Bev. Inc.; Walter Pearce; We Bev.
Inc.; John Petraglia; Jo-Lyn Bev. Corp.; Dirk Prelle;
West St. Bev. Inc.; James Ricciardi; Top Shelf Bev. Inc.;
Anthony Santelia; Santelia Dist., Inc.; Sal Scrimenti; 5
Scrimenti Bev. Inc.; Michael Sedita; S & D Beverage Corp.;
Walter Sieger; K & W Dist. Corp.; Mike Sommerman; 4 Plus
1 Bev. Inc.; Tom Spitz; L.J.T. Bev. Dist., Inc.; Tom
Umstatter; Tom's Beverage Corp.; Vincent Valentino; H & V
Bev. Inc.; Jethro Williams; Will & Lee Dist. Inc.;
Anthony Aielo; Anthony Cirelli; TNT Beverage; Joseph J.
D'Apuzzo; Philip J. Guglielmetti; Joe Dol Enterprises; J
& R Dist.; Kelly Beverage Inc.; Joseph Picarello; Just
the Beginning Bev. Corp.; T. Umps Family Beverage Inc.;
John Does 3-10, Plaintiffs-Appellants-Cross-Appellees,
v.
CANADA DRY BOTTLING COMPANY OF NEW YORK, INC.,
Defendant-Appellee-Cross-Appellant,
Harold Honickman; Stanley Israel; Dennis Berberich;
Ronald J. Srein; Transervice Lease Corporation, Inc.;
Evans Conger Broussard & McCrea; Soft Drink Workers Union
Local 812, International Brotherhood of Teamsters AFL-CIO;
Coca-Cola Company; Coors Bottling Company of New York,
Inc.; Kirsch Beverages Corp., Defendants-Appellees.
 Nos. 549, 711, Dockets 93-7368, 93-7444.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 11, 1994.
Decided May 13, 1994.
 
 Kenneth F. McCallion, New York City, Barbara J. Hart, James W. Johnson, Goodkind Labaton Rudoff & Sucharow, for plaintiffs-appellants-cross-appellees.
 Peter E. Greene, New York City, Jonathan J. Lerner, Gary A. MacDonald, Alan J. Meese, Skadden, Arps, Slate, Meagher & Flom, for defendant-appellee-cross-appellant.
 Before: PRATT and MINER, Circuit Judges, CAMPBELL,* Senior Circuit Judge.
 LEVIN H. CAMPBELL, Senior Circuit Judge:
 
 
 1
 In these appeals we review the district court's order granting in part and denying in part a motion for a preliminary injunction. We affirm the order in its entirety.
 
 
 2
 Plaintiffs-appellants are independent distributors of soft drink products bottled and/or distributed by defendant-appellee, Canada Dry Bottling Company of New York, Inc. ("Canada Dry").[1] On November 21, 1990, they sued Canada Dry and others in the United States District Court for the Eastern District of New York, alleging, inter alia, that Canada Dry had conspired to restrain the trade of soft drink products in violation of the Sherman Act, the Clayton Act, the Taft-Hartley Act, and the Racketeer Influenced and Corrupt Organization Act.
 
 
 3
 Two days later, on November 23, 1990, Plaintiffs moved for a temporary restraining order and a preliminary injunction to prevent Canada Dry "from engaging in certain conduct, including 'enforcing, directly or indirectly, against plaintiff-distributors any mandatory resale price [maintenance] policy or practice with respect to products distributed by [P]laintiffs' and from committing any violations of the Sherman Act, 15 U.S.C. Sec. 1." Magistrate Judge's Report and Recommendation, at 2 (Mar. 5, 1993) (quoting Plaintiffs' Memorandum of Law (Nov. 21, 1990)). Judge Sifton, who was then assigned to this case, denied Plaintiffs' application for a temporary restraining order, and, on December 7, 1990, heard argument on Plaintiffs' motion for a preliminary injunction. Judge Sifton reserved judgment on Plaintiffs' motion. Thereafter, Plaintiffs and Canada Dry, as well as the other defendants, entered into "protracted, court assisted, negotiations in an effort to settle this action." Id. Plaintiffs' November 23, 1990, "motion for a preliminary injunction was never decided and appears to have been abandoned." Id.
 
 
 4
 Over two years later, on February 4, 1993, Plaintiffs brought a fresh motion for a temporary restraining order and a preliminary injunction before Judge Weinstein, who was sitting as the "miscellaneous" judge. Plaintiffs say they filed this second application in response to new measures taken by Canada Dry to enforce its resale price maintenance policy. Plaintiffs assert in their appellate brief that these measures, which were associated with a funded promotional discount program implemented by Canada Dry, included
 
 
 5
 (1) Canada Dry's requirement that customer signatures be obtained on company invoices with fixed prices pre-printed on them whenever promotional monies were used, and that participation in promotional programs be conditioned on the use of company mandated prices; and (2) the withholding of product and refusal to release trucks for distributors who did not acquiesce to Canada Dry's promotional policy.
 
 
 6
 According to Plaintiffs, "[t]hese two enforcement mechanisms were not in place at the time of the filing of the November, 23, 1990, Motion For Preliminary Injunction."
 
 
 7
 Judge Weinstein, who was unaware of Plaintiffs' earlier injunctive applications in 1990, granted a temporary restraining order. He enjoined defendants Canada Dry, Harold Honickman, and Dennis Berberich (as well as their agents, servants, employees, attorneys, and all persons in active concert and participation with them) from:
 
 
 8
 1. engaging in coercive actions in order to force plaintiff-distributors into using "suggested" resale prices dictated by Canada Dry, including but not limited to, requiring the signature of customers on pre-printed invoices bearing company mandated prices printed on [them] before processing said invoices, and refusing to release loaded truck[s] of distributors who do not submit invoices with customers' signatures on them, and
 
 
 9
 2. otherwise fixing, maintaining and stabilizing the resale prices at which the distributors must resell soft drinks.
 
 
 10
 Judge Weinstein referred Plaintiffs' application for a preliminary injunction to Magistrate Judge Carter.
 
 
 11
 After a hearing on February 8 and 9, 1993, Magistrate Judge Carter issued a report and recommendation on March 5, 1993. He found that Plaintiffs had established
 
 
 12
 a likelihood of success on the merits on their claim that defendant's conduct in attempting to enforce resale price maintenance is a per se violation of the Sherman Act, but that the only irreparable harm of an imminent nature cognizable on this motion for emergency relief would be the destruction of any distributor's business that would result from [Canada Dry] withholding or otherwise refusing to provide product to plaintiff distributors.
 
 
 13
 In specifically considering activities associated with Canada Dry's promotional program, however, the magistrate judge found nothing wrong with Canada Dry's purpose "to ensure that [its] funded promotional discounts are passed on to retailers." Nevertheless, he rejected the company's policy of withholding product from and refusing to release the trucks of distributors who failed to adhere to promotional discount procedures--practices that he had found could lead to irreparable harm--because such action provided Canada Dry with "a ready opportunity to enforce resale price maintenance in the guise of enforcing compliance with its promotional program." Accordingly, the magistrate judge recommended that Plaintiffs' motion for an order enjoining Canada Dry from refusing to release distributors' "loaded trucks or otherwise withholding product from plaintiff distributors as a means of enforcing [its] promotional discount policy be granted." But to the extent that Plaintiffs sought to enjoin Canada Dry "from engaging in other conduct designed to enforce compliance with [its] promotional discount policies, including [its] policy requiring customer signatures on pre-printed invoices," the magistrate judge recommended that Plaintiffs' motion for a preliminary injunction be denied.
 
 
 14
 In an order entered on April 15, 1993, the United States District Court for the Eastern District of New York adopted and affirmed Magistrate Judge Carter's report and recommendation. The district court (1) granted Plaintiffs' motion for an order enjoining Canada Dry from refusing to release the distributors' loaded trucks or otherwise withholding product from the distributors, (2) denied Plaintiffs' motion for an order enjoining Canada Dry from engaging in other conduct designed to enforce compliance with its promotional program, including its policy of requiring customer signatures on pre-printed invoices, and
 
 
 15
 [ (3) ] ordered that, upon a particularized showing by [Canada Dry] that it cannot adequately protect itself against the loss of promotional monies expended through the use of accounting adjustment or other means, plaintiff distributors be required to post a bond adequate to secure the repayment to [Canada Dry] of promotional discount monies provided by [Canada Dry] but not passed on to retailers by plaintiff distributors.
 
 
 16
 On April 23, 1993, Plaintiffs filed a notice of appeal in which they appealed
 
 
 17
 from the second part and the third part of [the district court's] order, which would allow [Canada Dry], under the guise of enforcing its "promotional policy," to fix the prices at which independent wholesale distributors resell Canada Dry products by offering discounts to distributors on the condition that the discounts be "passed through" to the distributors' customers as a deduction from Canada Dry's "suggested" resale prices, and by requiring distributors to obtain customer signatures on pre-printed invoices with company resale prices for all products printed on them.
 
 
 18
 Canada Dry, in turn, appealed "from so much of the District Court's order entered on April 15, 1993, as preliminarily enjoined '[it] from refusing to release [P]laintiffs' loaded trucks or otherwise withholding product from plaintiff distributors.' "
 
 I.
 
 19
 Canada Dry's promotional program and its corresponding enforcement mechanisms (i.e., requiring customer signatures on company invoices, and withholding product and refusing to release trucks) constituted the central focus of Plaintiffs' preliminary injunction motion brought on February 4, 1993. In the following description of Canada Dry's arrangements with its distributors, we relate the details of the promotional program.
 
 
 20
 Canada Dry has the exclusive right in the greater New York City metropolitan area to bottle and deliver soft drinks under the Canada Dry label. These soft drinks are distributed to Canada Dry's retail customers by independent distributors, such as Plaintiffs, who operate in exclusive geographic territories. Canada Dry's distributors do not purchase from Canada Dry the soft drink products that they deliver to retailers. Rather, at the beginning of each day, Canada Dry's distributors check out a certain quantity of Canada Dry's soft drink products from Canada Dry's warehouse and deliver the products to retailers. Canada Dry's cash customers pay the distributors for the soft drink products at the time of delivery, while Canada Dry's credit customers pay Canada Dry directly through a credit arrangement. At the end of each day, the distributors return to Canada Dry's warehouse the soft drink products that they did not deliver to retailers and remit payment (in the form of cash or verified charge tickets that they collected from credit accounts) to Canada Dry for the quantity of soft drink products that they did deliver.
 
 
 21
 In return for their delivery services, Canada Dry pays its distributors a commission for each case of soft drink that is delivered. At the end of each day, Canada Dry calculates the difference in quantity between the soft drink product checked out at the beginning of the day and the soft drink product returned. For each case of soft drink that was delivered, the distributor retains a fixed percentage of Canada Dry's suggested wholesale price per case[2]--that is, the recommended price to the retailer--and remits the balance of the suggested wholesale price per case to Canada Dry.[3] Hence, as described by Canada Dry, "if the suggested wholesale price is $10 per case and the per case commission is $2, a distributor that delivered 100 cases would remit to Canada Dry (100 X ($10-$2)) or $800 out of the $1000 collected, thus retaining a commission of $200."
 
 
 22
 Periodically, "Canada Dry ... offers promotional events whereby the company provides special discounts for the benefit of retail establishments that purchase Canada Dry's products." Magistrate Judge's Report and Recommendation, at 17. Canada Dry makes these discounts available to retailers by reducing the suggested wholesale price of Canada Dry soft drink products that are being promoted by the full amount of the promotional discount. "A promotional discount does not affect the amount of commission earned by the distributor on the products sold pursuant to the promotion." Id. Thus, using our prior example, if the suggested wholesale price is $10, the promotional discount is $1, and the commission is $2, a distributor that delivers 100 cases of soft drink would collect $900 (100 X ($10-$1)), keep $200 in commission, and remit $700 to Canada Dry.
 
 
 23
 There is evidence in the record to indicate that Canada Dry distributors are not required to participate in Canada Dry promotions, and that those who choose not to may sell Canada Dry products at prices above, at, or below Canada Dry's suggested wholesale prices.[4] Participating distributors, however, are expected to pass along the discount to the retailer by "selling the products subject to the promotion at a price that equals the suggested [wholesale] price less the promotional discount." Id.
 
 
 24
 On December 15, 1992, Canada Dry distributed a memorandum to its distributors in which it restated the policies and "proper procedures" to be followed by those distributors who wished to participate in a promotion. As a preliminary matter, the memorandum emphasized that Canada Dry's distributors, to be eligible for promotional support, must apply the stipulated promotion as a discount to Canada Dry's suggested wholesale price. The memorandum then went on to state that a distributor could not receive credit for a promotion unless the distributor submitted a pre-printed invoice[5] to Canada Dry that contained, among other things, the signatures of both the distributor and the retailer.[6]
 
 
 25
 Because the distributors did not uniformly follow promotional program procedures, Canada Dry informed its distributors by letter dated January 27, 1993, that, effective February 1, 1993, it would not process and accept for credit any claim for promotional allowances that failed to comply fully with the procedures described in the December 15, 1992, policy announcement. Moreover, the letter stated:
 
 
 26
 In the event that any distributor submits a claim for promotional credits that do[es] not comply with the enclosed policy, the distributor will be required to pay the Company the amount improperly claimed as a promotional allowance at the same time the distributor satisfies his settlement sheet obligations with the Company for that day's sales. In the event such payments are not made, the Company retains its right to not load the distributor's truck.
 
 
 27
 (emphasis added).
 
 
 28
 Canada Dry first enforced its no-load policy on February 3, 1993. According to the affidavit of Dennis Berberich, President of Canada Dry, on that date
 
 
 29
 distributors responsible for approximately 15 of Canada Dry's total of 121 distribution routes failed to comply with the Company's promotional policy but insisted on improperly claiming credit for the amount of the Canada Dry funded promotions against what they owed Canada Dry for the prior day's deliveries.... This resulted in those distributors owing Canada Dry money for the prior day's deliveries that they refused to pay. Accordingly, pursuant to its policy, Canada Dry refused to allow those distributors to receive any Canada Dry product until they satisfied that monetary shortfall for the Canada Dry product that they had already delivered. However, any such distributor was permitted to remove its truck as soon as Canada Dry's products were unloaded from such vehicle.[7]
 
 
 30
 The following day, Plaintiffs moved for a temporary restraining order and for the instant preliminary injunction.
 
 II.
 
 31
 As we have said, Plaintiffs appeal only from the second and third part of the district court's order--that is, the decision (1) to deny Plaintiffs' motion for an order enjoining Canada Dry from engaging in conduct designed to further its promotional program, including the dual-signature requirement on pre-printed invoices, and (2) to require Plaintiffs to post a bond. Canada Dry, in turn, appeals only from the first part of the district court's order--that is, the district court's decision to enjoin Canada Dry from withholding product from its distributors or refusing to release its distributors' loaded trucks. Because the parties address these issues in their appellate briefs almost exclusively, we focus our review accordingly. See Fed.R.App.P. 28(a)(5) ("The argument must contain the contentions of the appellant on the issues presented, and the reasons therefor, with citations to the authorities, statutes, and parts of the record relied on."); United States v. Babwah, 972 F.2d 30, 34 (2d Cir.1992) ("Ordinarily, ... an argument not raised on appeal is deemed abandoned."). There is thus no occasion to review the magistrate judge's somewhat conclusory findings (1) that "[t]he credible evidence in the instant record establishes that [Canada Dry] has consistently utilized devices, including price surveillance, to force adherence to its suggested resale prices"; (2) that Plaintiffs have "established that there is likelihood of success on the merits on their claim that [Canada Dry's] conduct in attempting to enforce resale price maintenance is a per se violation of the Sherman Act"; but (3) that these devices do not threaten Canada Dry's distributors with imminent irreparable harm in that they (the devices) have "existed continuously from the onset of this lawsuit."
 
 
 32
 The standard for granting a preliminary injunction is well recognized. A party is entitled to a preliminary injunction only if it establishes: " '(1) irreparable harm [should the injunction not be granted] and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.' " ICN Pharmaceuticals, Inc. v. Khan, 2 F.3d 484, 490 (2d Cir.1993) (quoting Plaza Health Lab., Inc. v. Perales, 878 F.2d 577, 580 (2d Cir.1989)). We review a decision to grant or deny a preliminary injunction only for an abuse of discretion, "which, when found, usually consists of the application of an incorrect legal standard or the reliance on clearly erroneous findings of fact." Chemical Bank v. Haseotes, 13 F.3d 569, 573 (2d Cir.1994); see ICN Pharmaceuticals, Inc., 2 F.3d at 490.
 
 
 33
 Plaintiffs argue that Canada Dry's promotional program deprives the distributors of their ability to price independently both promotional and non-promotional soft drink products. The magistrate judge found, and there seems to be no dispute, that when distributors participate in the promotions they are expected to sell promotional items at a price equal to Canada Dry's suggested wholesale price less the promotional discount. Plaintiffs maintain that Canada Dry's promotional program also makes it impossible for them to sell non-promotional soft drink products at market prices because the distributors must necessarily reveal Canada Dry's suggested wholesale prices on those items when they obtain retailers' signatures on the pre-printed invoices. Thus, Plaintiffs contend that Canada Dry's promotional program constitutes a vertical, maximum-price-fixing scheme that violates per se Sec. 1 of the Sherman Act. The district court did not agree with Plaintiffs. It concluded that the described promotional program passed muster under antitrust laws except to the extent that the withholding of product and impounding of trucks provided Canada Dry with too ready an "opportunity to enforce resale price maintenance in the guise of enforcing compliance with its promotional program." We do not think the court below applied an incorrect legal standard or relied on clearly erroneous findings of fact in reaching this conclusion.
 
 
 34
 To be sure, in Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), the Supreme Court held "that a vertical, maximum-price-fixing scheme was unlawful per se under Sec. 1 of the Sherman Act because it threatened to inhibit vigorous competition by the dealers bound by it and because it threatened to become a minimum-price-fixing scheme." Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 335, 110 S.Ct. 1884, 1889, 109 L.Ed.2d 333 (1990) (assuming, "arguendo, that Albrecht correctly held that vertical, maximum price fixing is subject to the per se rule").[8] Nevertheless, not all vertical arrangements affecting price constitute resale price maintenance agreements that violate Sec. 1 of the Sherman Act. See AAA Liquors, Inc. v. Joseph E. Seagram & Sons, Inc., 705 F.2d 1203, 1205 (10th Cir.1982), cert. denied, 461 U.S. 919, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983). "The combination required under Section 1 must be demonstrated by proof of:
 
 
 35
 (1) an express or implied agreement, or
 
 
 36
 (2) the securing of actual adherence to prices by means beyond mere refusal to deal."
 
 
 37
 Belfiore v. New York Times Co., 654 F.Supp. 842, 851 (D.Conn.1986), aff'd, 826 F.2d 177, 181 (2d Cir.1987) (" '[A] supplier may not use coercion on its retail outlets to achieve resale price maintenance.' " (quoting Simpson v. Union Oil Co., 377 U.S. 13, 17, 84 S.Ct. 1051, 1054, 12 L.Ed.2d 98 (1964))), cert. denied, 484 U.S. 1067, 108 S.Ct. 1030, 98 L.Ed.2d 994 (1988); accord Yentsch v. Texaco, Inc., 630 F.2d 46, 52 (2d Cir.1980) ("[C]oercion that achieves actual price-fixing is illegal."). Evidence of pricing suggestions, persuasion, conversations, arguments, exposition, or pressure is not sufficient to establish the coercion necessary to transgress Sec. 1 of the Sherman Act. Yentsch, 630 F.2d at 53; Belfiore, 654 F.Supp. at 851. Rather, evidence of threats of termination or other explicitly coercive conduct that secure adherence to fixed prices is what supports "a finding of an illegal combination." Yentsch, 630 F.2d at 53; see Belfiore, 654 F.Supp. at 851.
 
 
 38
 There is evidence in the record to indicate that Canada Dry does not require its distributors to participate in its promotions and that non-participating distributors may sell Canada Dry promotional products at, above, or below Canada Dry's suggested wholesale prices. Nonetheless, Plaintiffs assert that, as a practical matter, Canada Dry's distributors must participate in the promotions in order to survive. There is nothing in the record, however, forcing this conclusion.
 
 
 39
 The district court found, moreover, that, other than with regard to the withholding of product and impounding of trucks, Plaintiffs did not "establish that there is any likelihood of success on the merits or any sufficiently serious question going to the merits relating to their claim that Canada Dry may not engage in conduct [--including Canada Dry's policy requiring customer signatures on pre-printed invoices--] designed to ensure that Canada Dry funded promotional discounts are passed on to retailers." The court observed that a manufacturer, who, from its own pocket, grants a discount (as Canada Dry does here) through its distributor to its retailer, has a legitimate interest in making sure that the distributor " 'is not pocketing the price support instead of passing it on.' " AAA Liquors, 705 F.2d at 1206 (quoting Lehrman v. Gulf Oil Corp., 464 F.2d 26, 40 (5th Cir.), cert. denied, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972)). Other courts, as well as the court below, have concluded that a manufacturer should be allowed to implement reasonable procedures to ensure that the discount is, in fact, passed along to the retailer. See Jack Walters & Sons Corp. v. Morton Bldg., Inc., 737 F.2d 698, 708 (7th Cir.), cert. denied, 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984). Provided it is established that Canada Dry's distributors voluntarily elect to take part in promotions, we would agree with the district court that requiring them to (1) sell Canada Dry promotional products at a price equal to the suggested wholesale price less the discount, and (2) obtain retailers' signatures on invoices to document their receipt of the discount may be found to be reasonable and permissible ways for Canada Dry--which is paying for the discounts--to ensure that its distributors pass these along to the retailers.
 
 
 40
 The district court determined that Canada Dry's policy of requiring its distributors to obtain retailers' signatures on pre-printed invoices that disclose Canada Dry's suggested wholesale prices on non-promotional soft drink items does not constitute the coercion necessary to trigger a Sec. 1 violation. The court noted that it is well established that the "antitrust laws do not prohibit the undoubtedly persuasive conduct of a manufacturer suggesting a price ... for which the product should be available." Martindell v. News Group Publications, Inc., 621 F.Supp. 672, 678 (E.D.N.Y.1985) (citing Jack Walters & Sons Corp., 737 F.2d at 707 ("[I]t is perfectly lawful for a manufacturer to advertise his product to the ultimate consumer, whether or not he sells directly to the consumer, and to mention in that advertising the retail price of the product--the only price the consumer is interested in.")); Belfiore, 654 F.Supp. at 852 ("[A]dvertising of discount prices does not constitute coercion by a supplier even if such advertising causes an independent dealer's customers to expect or demand a lower price.").
 
 
 41
 It is true that Canada Dry retailers who learn of Canada Dry's suggested wholesale prices may resent and even resist paying a higher price to the distributors. This result, however, simply "reflect[s] the working of a free market in which [the retailers] have acquired relevant information," 8 Phillip E. Areeda, Antitrust Law p 1639d (1989), and does not amount to resale price maintenance. Hence, we cannot say, at least on the record as presently developed, that the district court abused its discretion by refusing to enjoin Canada Dry from requiring its distributors to use pre-printed invoices that list Canada Dry's suggested wholesale prices on both promotional and non-promotional items.
 
 III.
 
 42
 The district court preliminarily enjoined Canada Dry from refusing to release the distributors' loaded trucks or otherwise withholding product from the distributors. Canada Dry, in its cross appeal, argues that the district court abused its discretion in granting this relief. We do not agree. We find sufficient justification for the lower court's concern that, if Canada Dry remained free to make the product-withholding decision unilaterally, it would use this authority for illegal resale price maintenance purposes.
 
 
 43
 Canada Dry assigns error to the district court's conclusion that Plaintiffs demonstrated a likelihood of success on the merits, or at least sufficiently serious questions going to the merits, that Canada Dry's policy of withholding product violates Sec. 1 of the Sherman Act. The court below found that, "[i]f defendant is permitted to withhold product as a means of enforcing compliance with its promotional discount program, that privilege could readily be exploited as a pretext for enforcing resale price maintenance." In response to this finding, Canada Dry submits that Plaintiffs have offered "no evidence to support the claim that [it] has withheld product for reasons unrelated to promotional discounts." (emphasis in Canada Dry's brief).
 
 
 44
 Canada Dry also contests the district court's decision that Canada Dry's enforcement mechanism of withholding product from non-complying distributors threatens the viability of the distributors' businesses and therefore constitutes irreparable harm. Canada Dry maintains that plaintiffs generally have an obligation to mitigate their damages and a failure to do so proscribes any finding of irreparable harm. Canada Dry asserts that the district court completely overlooked that the distributors could have avoided Canada Dry's enforcement mechanism either by opting out of the promotional program altogether or by following the promotional program's procedures. Therefore, Canada Dry insists, any irreparable harm to the distributors was self-inflicted in that Canada Dry withheld product only from those distributors who elected to participate in the promotional program but refused to abide by its terms. Under these circumstances, Canada Dry asserts that injunctive relief was appropriate only upon a showing by Plaintiffs, which Canada Dry argues they failed to make, that the distributors would be irreparably harmed either by foregoing the promotional program or by participating in it according to its terms.
 
 
 45
 The record, however, is not as entirely bereft of evidence as Canada Dry insists to support the district court's concerns that product would be withheld improperly. There is some evidence permitting the inference that Canada Dry managers may, in fact, have withheld product from distributors who failed to turn in customer-signed, pre-printed invoices even when the invoices did not include claims for promotional discounts. Moreover, there is some evidence that Canada Dry impounded the truck of at least one distributor who failed to have all of his invoices signed by retailers even though many of the invoices did not involve promotional discounts. And finally, there are the magistrate judge's findings of credible evidence that Canada Dry "has consistently utilized devices, including price surveillance, to force adherence to its suggested retail prices," and of a likelihood of success by Plaintiffs on their price-fixing claim. The foregoing provides sufficient support for the district court's conclusions (1) that the withholding of product and impounding of trucks might be used by Canada Dry to enforce resale price maintenance rather than merely to police its promotional program, and (2) that any distributor who, during the pendency of this proceeding, was cut off from the supply of product for refusing to sell at Canada Dry's suggested prices could be driven out of business and thereby irreparably harmed. Under the abuse of discretion standard utilized in reviewing a preliminary injunction, we cannot say the district court erred in temporarily enjoining Canada Dry pendente lite from withholding product from the distributors and impounding their trucks. See United States Steel Corp. v. Fraternal Ass'n of Steelhaulers, 431 F.2d 1046, 1048 (3d Cir.1970) ("This limited review is necessitated because the grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief. Weighing these considerations is the responsibility of the district judge; only a clear abuse of his discretion will justify appellate reversal.").
 
 IV.
 
 46
 Finally, we have considered Plaintiffs' contention that the district court abused its discretion in ordering them--upon a particularized showing by Canada Dry that it cannot adequately protect itself against the loss of promotional monies expended through the use of accounting adjustment or other means--to post a bond adequate to secure the repayment to Canada Dry of promotional discount monies provided by Canada Dry but not passed on to retailers by the distributors. We see nothing unreasonable about this order, especially in the absence of a concrete situation in which such a bond has yet been ordered.
 
 
 47
 The order of the district court entered April 15, 1993, is affirmed. Each party shall bear its own costs.
 
 
 
 *
 The Honorable Levin H. Campbell, United States Court of Appeals for the First Circuit, sitting by designation
 
 
 [1]
 Canada Dry is just one of several named defendants in this lawsuit
 
 
 [2]
 At any given time, Canada Dry has one recommended wholesale price for each of its product offerings
 
 
 [3]
 For purposes of calculating the distributors' commissions, charge tickets obtained from approved Canada Dry credit customers are treated as though they are cash collected
 
 
 [4]
 Therefore, as Canada Dry observes, "if the suggested wholesale price is $10 per case, and a distributor is able to charge $11 per case on 100 cases, it will realize $100 of income in excess of its commission."
 
 
 [5]
 Since March 1990, Canada Dry has required its distributors to use pre-printed invoices that list the suggested wholesale prices of all products offered by Canada Dry. Canada Dry will accept no other invoices from its distributors. To avoid showing retailers the pre-printed invoices listing the suggested wholesale prices of all Canada Dry products, some distributors would use their own invoices with their own prices handwritten on them and then, at the end of the day, transfer the information from their invoices onto Canada Dry's pre-printed invoices, which they would then submit to Canada Dry for credit
 
 
 [6]
 According to Canada Dry, this dual-signature policy "is designed to verify that the customer has received the Canada Dry promotional discount and that it was not simply pocketed by distributors, falsely claiming that it had been provided to the retailer." Plaintiffs contend, however, that, because the dual-signature policy forces them to show retail customers the pre-printed invoices, which list the suggested wholesale prices of all Canada Dry products "regardless of whether or not they [are] subject to promotional discounts that particular week, the practical impact of the policy [is] to eliminate the distributors' ability to charge their own resale prices for any products while at the same time participating in [Canada Dry's] promotional program."
 
 
 [7]
 Plaintiffs assert that Canada Dry actually impounded the trucks of those distributors who failed to obtain the retailers' signatures on the pre-printed invoices
 
 
 [8]
 Although the viability of Albrecht 's principles is in some doubt following the Supreme Court's decision in Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), Albrecht has not yet been overturned. 8 Phillip E. Areeda, Antitrust Law pp 1638, 1639 (1989) (suggesting, however, that the Supreme Court may have silently overruled Albrecht in its Sylvania decision); see Jack Walters & Sons Corp. v. Morton Bldg., Inc., 737 F.2d 698, 706-07 (7th Cir.), cert. denied, 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984)