717 F.2d 757
 Fed. Sec. L. Rep. P 99,501
BUFFALO FORGE COMPANY, Ampco-Pittsburgh Corporation, and
Ampco-Pittsburgh Securities II Corporation,
Plaintiffs-Appellants, Cross-Appellees,
v.
OGDEN CORPORATION, Defendant-Appellee, Cross-Appellant,
and
David R. Newcomb, Raymond J. Popp, Thomas W. Burke, Edward
W. Duffy, John R. Gregory, and Frederick S.
Pierce, Defendants-Appellees.
 Cal. Nos. 1441, 1602, Dockets 83-7199, 83-7211.
 United States Court of Appeals,
Second Circuit.
 Argued June 15, 1983.
Decided Sept. 22, 1983.
 
 Jay Topkis, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, Jack Hassid, Colleen McMahon and Andrew J. Peck, New York City, of counsel), for plaintiffs-appellants, cross-appellees Buffalo Forge Company, et al.
 John L. Warden, New York City (Sullivan & Cromwell, David B. Tulchin, William L. Farris and Lori F. Damrosch, New York City, of counsel), for defendant-appellee, cross-appellant Ogden Corp.
 Vaughn C. Williams, New York City (Skadden, Arps, Slate, Meagher & Flom, Charles M. Yablon and Janet L. Goetz, New York City, of counsel), for defendants-appellees.
 Before VAN GRAAFEILAND, PIERCE and WISDOM,* Circuit Judges.
 VAN GRAAFEILAND, Circuit Judge:
 
 
 1
 This appeal presents us with questions concerning the legality of management's attempts to thwart a corporate takeover where the bidder has made a financially unsatisfactory tender offer. The facts are set forth in detail in the district court's opinion reported in 555 F.Supp. at 892 and require only brief summarization herein.
 
 
 2
 In response to a tender offer of $25 per share made on January 2, 1981 by plaintiff, Ampco-Pittsburgh Corporation, the individual defendants, the Board of Directors of Buffalo Forge Company, began a search for more favorable offers. After some negotiations, they approved a merger proposal from defendant, Ogden Corporation, calling for an even exchange of Ogden stock, then trading at $32.75, for shares of Buffalo Forge. As part of the "Agreement and Plan of Reorganization" between the parties, the directors agreed to sell Ogden 425,000 shares of Buffalo Forge treasury stock at $32.75 per share, to be paid for by a ten-year, nine percent note in the face amount of $13,918,750, and gave Ogden a one-year option to purchase an additional 143,400 treasury shares on similar terms. A bidding war between Ampco and Ogden ensued, which Ampco won with a bid of $37.50 per share.
 
 
 3
 After completing the takeover through its wholly-owned subsidiary, Ampco-Pittsburgh Securities II Corporation, Ampco refused to recognize the Ogden agreement, contending that it resulted from a breach of the directors' fiduciary duties and constituted a manipulative device in violation of section 14(e) of the Williams Act, 15 U.S.C. Sec. 78n(e). Ampco refused the tender of Ogden's 425,000 shares, refused to pay dividends on the stock held by Ogden, and denied Ogden the right to exercise its option for the purchase of additional shares. Ampco sued for rescission of the transaction and sought damages from the individual defendants in the event rescission was denied.
 
 
 4
 After a bench trial in the United States District Court for the Western District of New York, Chief Judge Curtin dismissed Ampco's claims. He held that the Buffalo Forge directors did not violate their fiduciary obligations in selling the treasury stock to Ogden and that the sale was not a manipulative device prohibited by the Williams Act. He also held that Ampco did not have standing to rescind the sale under section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78cc(b), because neither it nor Buffalo Forge was an unwilling innocent party to the contract. He disposed of Ogden's counterclaim by holding that Ogden was entitled to $37.50 for each of the treasury shares it owned or had attempted to buy on option and that it was entitled to the declared but unpaid dividend. He ordered pre-judgment interest at the statutory rate. N.Y.Civ.Prac.Law Secs. 5001, 5004 (McKinney 1963 & Supp.1982). Judgment was entered denying plaintiffs all relief and awarding Ogden judgment against plaintiffs in the amount of $24,598,272. We affirm.
 
 
 5
 In view of the district court's findings, all of which have substantial support in the evidence, appellants' contentions concerning alleged breaches of fiduciary duty by the defendant directors merit little more comment than is contained in the district court's opinion. The district court found:
 
 
 6
 (1) None of the directors was "motivated to oppose Ampco's tender offer and accept Ogden's offer due to self-interest" and the directors "voted for the Ogden $32.75 offer because it was the best offer available," 555 F.Supp. at 904;
 
 
 7
 (2) The directors were not guilty of fraud or bad faith, id. at 903-04;
 
 
 8
 (3) There were no improprieties in the relationships between the directors and the company's financial and legal advisors or in the directors' reliance upon the counsel which the advisors gave, id.;
 
 
 9
 (4) The negotiations with Ogden were at arm's length, and the price received for the treasury stock, based on the discounted value of Ogden's note, exceeded the cost of the stock, its book value and its normal trading price, id. at 904-05.
 
 
 10
 Under the circumstances, it would have been a mistake for the district court to substitute its judgment for the business judgment of the directors, the exercise of which brought about an increase in Ampco's tender offer from $25 a share to $37.50 a share. See Auerbach v. Bennett, 47 N.Y.2d 619, 630-31, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979); Treadway Cos. v. Care Corp., 638 F.2d 357, 382-83 (2d Cir.1980); Crouse-Hinds Co. v. Internorth, Inc., 634 F.2d 690, 701-04 (2d Cir.1980); N.Y.Bus.Corp.Law Secs. 504(e), 717 (McKinney 1963 and Supp.1982).
 
 
 11
 It also would have been a mistake for the district court to adopt Ampco's argument that the sale of the treasury stock violated section 14(e) of the Williams Act, 15 U.S.C. Sec. 78n(e), which proscribes "fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer." In advancing this argument, Ampco relied on the Sixth Circuit case of Mobil Corp. v. Marathon Oil Corp., 669 F.2d 366 (6th Cir.1981). In that case, Marathon, in an attempt to avoid a takeover by Mobil, gave United States Steel Corporation, a competing bidder, an option to purchase a large number of Marathon's treasury shares and an option to purchase a valuable oil field. The court held that the options, individually and in combination, circumvented the natural forces of market demand and, therefore, were manipulative acts under the statute. Id. at 376-77. It concluded that Mobil was entitled to injunctive relief.
 
 
 12
 We believe that Marathon was an unwarranted extension of the Williams Act. "The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party." Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 58, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975). The Act "was designed solely to get needed information to the investor." Piper v. Chris-Craft Indus., Inc., 430 U.S. 1, 31, 97 S.Ct. 926, 944, 51 L.Ed.2d 124 (1977). An essential ingredient of a section 14(e) cause of action, therefore, is misrepresentation, i.e., the omission or misstatement of material facts. Lewis v. McGraw, 619 F.2d 192, 195 (2d Cir.), cert. denied, 449 U.S. 951, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980); Chris-Craft Indus., Inc. v. Piper Aircraft Corp., 480 F.2d 341, 373 (2d Cir.), cert. denied, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); Atchley v. Qonaar Corp., 704 F.2d 355, 359 (7th Cir.1983); Panter v. Marshall Field & Co., 646 F.2d 271, 283 (7th Cir.), cert. denied, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981).
 
 
 13
 The Marathon court's concern that it would cost nonfavored bidders, seeking 40,000,000 shares of Marathon stock, "1.1 to 1.2 billion additional dollars to match the U.S.S. tender offer", 669 F.2d at 375, is not the sort of concern that motivated Congress in enacting the Williams Act. "[T]ender offerors were not the intended beneficiaries of the bill...." Piper v. Chris-Craft Indus., Inc., supra, 430 U.S. at 28, 97 S.Ct. at 942. Congress felt that cash tender offers were similar to proxy contests and saw no reason why disclosure should not be required in the former as in the latter. H.R.Rep. No. 1711, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.Code Cong. & Ad.News 2811, 2813. The Act, therefore, was "designed to make the relevant facts known so that shareholders have a fair opportunity to make their decision." Id.
 
 
 14
 Although Congress intended that the Act should favor neither management nor takeover bidders and should give neither an undue advantage that would frustrate the exercise of an informed choice by investors, Congress's concern was more with the procedural provisions of the Act than with the substantive terms of takeover bids. For example, in pursuance of its policy of impartiality, Congress rejected all legislative proposals that might have caused excessive delays in the tender offer process, because it felt that excessive delays unduly favored incumbent management. Edgar v. Mite Corp., 457 U.S. 624, 632-639, 102 S.Ct. 2629, 2636-39, 73 L.Ed.2d 269 (1982). Congress felt that it was for fully-informed investors to decide whether takeover offers were fair and equitable and that the investors should "be free to make their own decisions." Id. at 640, 102 S.Ct. at 2640. Congress's ban on "manipulative acts and practices" was directed only at rigged transactions that might mislead investors in the making of these decisions. Billard v. Rockwell Int'l Corp., 683 F.2d 51, 56 (2d Cir.1982), quoting Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 476-77, 97 S.Ct. 1292, 1302-03, 51 L.Ed.2d 480 (1977). There were no misleading, manipulative acts in the instant case. In short, we agree with the district court that Ampco's reliance on Marathon was misplaced and that the defendants herein did not violate section 14(e). See Note, Developments in Corporate Takeover Techniques: Creeping Tender Offers, Lockup Arrangements, and Standstill Agreements, 39 Wash. & Lee L.Rev. 1095 (1982).
 
 
 15
 The district court did not err in awarding pre-judgment interest at the statutory rate. See United Bank Ltd. v. Cosmic Int'l, Inc., 542 F.2d 868, 878 (2d Cir.1976). Our disposition on the merits makes it unnecessary to discuss the parties' contentions concerning lack of standing and availability of remedies. The judgment of the district court is affirmed.
 
 
 
 *
 Senior Circuit Judge of the Fifth Circuit, sitting by designation